CLINTON MEMORIAL HOSPITAL,
Appellant

v.

Donna E. SHALALA, Secretary,
Department of Health and
Human Services, Appellee.

No. 92–5107.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 17, 1993.

Decided Dec. 10, 1993.

Kathleen Houston Drummy, Los Angeles, CA, argued the cause for appellant. With her on the briefs were Richard K. Simon, Tracy Green, Los Angeles, CA, and Amy Hancock, Washington, DC.

Kathleen M. Scully–Hayes, Counsel, U.S. Dept. of Health and Human Services, Washington, DC, argued the cause for appellee. With her on the brief were Stuart Schiffer, Acting Asst. Atty. Gen., and J. Ramsey Johnson, U.S. Atty., Washington, DC.

Before: EDWARDS, WILLIAMS, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Clinton Memorial Hospital, a rural public hospital certified as a provider of services in the federal Medicare program, challenges administrative regulations that prevent it from being treated as a "sole community hospital" under that program. The district court upheld the regulations. *Clinton Memorial Hosp. v. Sullivan,* 783 F.Supp. 1429 (D.D.C. 1992). We affirm.

\* \* \*

In 1972 Congress authorized the Secretary of Health, Education and Welfare to establish limits on the costs that hospitals could recover for care of Medicare beneficiaries. Pub.L. No. 92–603 § 223, 86 Stat. 1329, 1393 (1972). The House Ways and Means Committee and the Senate Finance Committee, however, both said that they "expect[ed]" the provision not to apply in communities with only one hospital, reasoning that beneficiaries in those communities would be unable to shop around for hospital services, and that in any event the absence of comparative cost data in such localities would make it hard to set appropriate limits. See H.R.Rep. No. 231, 92d Cong., 1st Sess. 84 (1971); S.Rep. No. 1230, 92d Cong., 2d Sess. 188 (1972), U.S.Code Cong. & Admin.News 1972, p. 4989. Taking the hint, the then-Secretary promulgated regulations authorizing exemptions for any hospital that

by reason of factors such as isolated location or absence of other providers of the same type, is the sole source of such care reasonably available to beneficiaries.

20 CFR § 405.460(f)(4) (1975).

The definition of hospitals eligible to be treated as "sole community hospitals" ("SCHs") remained purely regulatory until 1983. In that year, Congress—seeking to encourage hospitals to operate more effi-

ciently—abandoned the old method of reimbursing Medicare providers and instituted the "Prospective Payment System", which pays hospitals flat sums based on the diagnoses of the Medicare beneficiaries treated. Aware that some hospitals might not flourish under this system, Congress established a different reimbursement formula for sole community hospitals and for the first time provided a statutory definition of the term. Drawing heavily on the definition contained in the Secretary's prior regulations, Congress declared:

> [T]he term 'sole community hospital' means a hospital that, by reason of factors such as isolated location, weather conditions, travel conditions, or absence of other hospitals (as determined by the Secretary), is the sole source of inpatient hospital services reasonably available to individuals in a geographical area who are entitled to benefits under part A [the portion of the Medicare program covering payment for in-patient hospital care].

Pub.L. No. 98–21 § 601(e), 97 Stat. 158 (1983) (current version at 42 U.S.C. § 1395ww(d)(5)(D)(iii) (Supp. III 1991)).

The Secretary responded with new regulations that established more clear-cut criteria for granting SCH status. See 48 Fed.Reg. 39752, 39780–82 (1983) (proposed regulations); 49 Fed.Reg. 234, 270–72 (1984) (final regulations). The regulations established four categories, based on the hospital's proximity to any "like hospital".[1] Roughly speaking, the closer a hospital was to any like hospital, the heavier was its burden to show that it was, nonetheless, a sole community hospital. First, neither urban hospitals nor rural hospitals located within 15 miles of another like hospital could ever be classified as SCHs (except by virtue of a grandfathering provision). Second, rural hospitals located between 15 and 25 miles of other like

hospitals could be SCHs only if "local topography or periods of prolonged severe weather conditions" made the other like hospitals "inaccessible for at least one month out of each year". Third, a rural hospital located between 25 and 50 miles of the nearest like hospital could qualify as an SCH if *either* the other hospitals were inaccessible in this sense *or* the applying hospital accounted for at least 75 percent of the hospital admissions of residents in its service area. Finally, rural hospitals located more than 50 miles away from the nearest like hospital could receive SCH treatment without any further showing. 42 CFR § 412.92(a) (1985).[2] In all cases, mileage is measured as distance over "improved roads". *Id.* at § 412.92(c)(1). Clinton Memorial Hospital loses out under these regulations—it lies within 25 miles of three other "like hospitals" and cannot show a month of inaccessibility.

Here Clinton attacks the regulations on a variety of substantive and procedural theories. The district court rejected the challenges, and so do we.

### I

■ Clinton first asserts that the Secretary has a statutory obligation to consider the admitting practices of local physicians, the availability of public transportation, and other factors when assessing a hospital's application for SCH status—even if the hospital is located within 25 miles of another like facility and if neither topography nor weather renders the other facility inaccessible for a full month. These factors sometimes were decisive under the regulatory scheme that prevailed before 1983. Although the Health Care Financing Administration ("HCFA"), the agency through which the Secretary administers the Medicare program, noted in a 1974 "Intermediary Letter" that "generally"

---

1. The regulations define "like hospital" as "a hospital furnishing short-term, acute care"; the Secretary does not compare specialty services. 42 CFR § 412.92(c)(2) (1985). This definition is not under attack here. Cf. *Community Hosp. v. Sullivan*, 986 F.2d 357, 361 (10th Cir.1993) (upholding application of this definition).

2. These regulations (and the underlying statutory definition) have changed in certain details over

the years. For instance, the 50–mile threshold has been reduced (first by regulation and then by statute) to a 35–mile threshold, and even urban hospitals now qualify as SCHs if the nearest like hospital is more than 35 miles away. The inaccessibility criterion has been slightly relaxed, and other changes have been made. But these alterations are not crucial to our disposition of the case.

hospitals within 25 miles of a like facility would not qualify for the exemption, I.L. No. 74–22 (July 1974), [1974 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 27,044, another Intermediary Letter in 1978 suggested that hospitals should receive SCH status whenever the admitting patterns of local physicians resulted in "general nonuse of the otherwise closest like facilities by residents in the hospital's service area". I.L. No. 78–17 (April 1978), [1978 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 28,-972. In practice, hospitals within 25 miles of a like hospital occasionally won the status even when the other like facilities were not as physically inaccessible as is now required. See, e.g., *Hamilton Memorial Hosp. v. Schweiker,* [1982 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 32,109 (N.D.Ga., June 30, 1982); *Santa Ynez Valley Hosp. v. Blue Cross Ass'n,* [1978 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 29,221 (PRRB July 25, 1978); see also *St. Elizabeth Community Hosp. v. Heckler,* 745 F.2d 587 (9th Cir.1984); *Graham Hosp. Ass'n v. Heckler,* 739 F.2d 285 (7th Cir.1984). Clinton contends that Congress intended to preserve the factors that were considered under the old regulations.

Measured against the statutory language, the Secretary's regulation appears neither to contradict "the unambiguously expressed intent of Congress" nor to be an impermissible reading of the statute. See *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). The Secretary has taken into account each of the four overlapping factors that Congress identified in 1983— isolated location, weather conditions, travel conditions, and absence of other hospitals.[3] Although it is true that in some cases mileage alone ("isolated location" and "absence of other hospitals") will resolve a case (hospitals

within 15 miles of a like hospital never qualify, ones more than 50 miles away always do), nothing in the statutory language suggests that Congress intended each of the four variables to be considered as to every applicant hospital. Interestingly, Clinton's category (a hospital with a like hospital located 15 to 25 miles away) takes account of all four factors—under the rubric of "accessibility". While one might argue that alternative hospitals are not "reasonably available" (within the meaning of the statute) in a community whose doctors cannot or do not currently admit patients to them, the Secretary's contrary interpretation of the statutory language seems permissible, in light of the statute's failure to refer to admitting patterns and its delegation to the Secretary of primary responsibility for implementing the SCH definition.

Clinton protests, however, that the background of the statutory definition of "sole community hospital" makes clear Congress's desire to preserve the factors that mattered before 1983, and that the post–1983 regulations violate this unambiguous intent. To stave off criticism that it is elevating legislative history over statutory text, Clinton first asserts that the statutory definition of SCH uses the phrases "isolated location" and "absence of other hospitals"—the two factors that had appeared in the Secretary's old regulatory definition—as "terms of art" meant to incorporate all the factors that were relevant before 1983. Clinton invokes *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), but these two phrases hardly qualify as words that reflect "the legal tradition and meaning of centuries of practice", *id.* at 263, 72 S.Ct. at 250 (considering meaning of "steals" in a criminal statute).

Nor does Clinton's theory get much support from the general context in which Con-

---

**3.** The current version of the statute explicitly refers to the "absence of other *like* hospitals", see 42 U.S.C. § 1395ww(d)(5)(D)(iii) (Supp. III 1991) (emphasis added), but the Secretary has focused on "like" hospitals all along, see *supra* at 856 n. 1; the statutory refinement has thus made no difference in practice. Cf. *id.* at 856 n. 2. A more significant difference between the original and the current statutory definitions of SCHs crops up in Clinton's argument that until very

recently the Secretary failed to treat travel *time* as a separate criterion, despite a statutory mandate to do so. Clinton overlooks the fact that this factor was not added to the statutory list until 1989, see Pub.L. No. 101–239 § 6003(e)(1)(A)(iv), 103 Stat. 2142–43 (1989), and the Secretary specifically included it in her regulations the next year, see 55 Fed.Reg. 36070 (1990), 42 CFR § 412.92(a)(3) (1992).

gress enacted its definition of "sole community hospital". While Congress obviously modeled the 1983 statutory definition on the pre-1983 regulatory definition, it did not enact the Intermediary Letters that the HCFA had released while operating under that regulation, nor did it follow the lead of those Letters by specifically including such factors as patient admitting patterns. Indeed, Congress did not even enact the old regulation itself. Congress specifically added two factors, travel and weather conditions, that had been considered under the prior regulation but that had not appeared in the regulation; the addition would have been pointless if Congress really thought that it was incorporating *all* the factors that the HCFA or the courts had thought relevant under the prior regulation.

Clinton therefore seeks support deeper in the legislative history. It comes up with a Senate Finance Committee report saying:

> The committee is concerned that, in determining which hospitals have been eligible for exceptions and adjustments as sole community providers in the past, the Secretary has applied *different criteria in the different regions of the country,* including some which are very narrow and restrictive. *Therefore,* the committee *expects that the Secretary,* in making such determinations for sole community providers under the new prospective payment system, *will develop and take into account a much broader range of factors* relating to beneficiary access to basic hospital services.

S.Rep. No. 23, 98th Cong., 1st Sess. 54 (1983), U.S.Code Cong. & Admin.News 1983, pp. 143, 194 (emphasis added). The committee's pejorative mention of "very narrow and restrictive" criteria, Clinton asserts, refers to a 1982 General Accounting Office report that condemned the HCFA's Denver Regional Office for applying a 25-mile criterion without considering "the extent to which patients from the applying hospital's area obtained care from other hospitals". *GAO Report on § 223 Hospital Reimbursement Limits* (Aug. 6, 1982), [1982 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 32,212 [hereafter *GAO Report* ]. In this argument, Clinton

departs from the theory that the 1983 legislation was intended to freeze the old regulatory scheme and argues instead that it was intended to expand it.

Largely on the strength of the committee's statements, two district courts have agreed with Clinton's position. See *Central Oregon Hosp. Dist. v. Sullivan,* 757 F.Supp. 1134 (D.Or.1991); *Mary Imogene Bassett Hosp. v. Sullivan,* [1989–2 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 37,831 (N.D.N.Y. 1988). In addition to the court below, however, the 8th Circuit and several district courts have upheld the regulation. See *Macon County Samaritan Memorial Hosp. v. Shalala,* 7 F.3d 762 (8th Cir.1993); *Public Hosp. Dist. No. 1 v. Sullivan,* 806 F.Supp. 1478 (E.D.Wash.1992); *John Fitzgibbon Memorial Hosp. v. Sullivan,* No. 90–0179, 1991 WL 438315, 1991 U.S.Dist. LEXIS 18453 (W.D.Mo. Dec. 11, 1991); *A.O. Fox Memorial Hosp. v. Sullivan,* No. 89–CV–716, 1989 WL 153730, 1989 U.S.Dist. LEXIS 15222 (N.D.N.Y. Dec. 12, 1989). It is far from clear to us that anything in a Senate committee report—which is neither adopted by the House nor presented to the President, see *Immigration and Naturalization Serv. v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983)—could condemn as impermissible an interpretation fitting squarely within the statutory language. Even if a legislative report theoretically could have such power, this one does not.

For one thing, the paragraph that appellant invokes starts out deploring regional variability and then moves by means of a "therefore" to its call for a broader range of factors. The sequence suggests that the committee's concern was more that the Secretary address the issue more systematically and consistently (and perhaps in more detail) than that he increase the number of factors considered.

In any event, the committee's call for uniformity cuts against the notion that Congress meant to incorporate the Intermediary Letters of the 1970s, or any other broad criteria that did not set out clear-cut standards. At best, then, the committee was sending the Secretary conflicting signals.

Clinton also flatly misinterprets the committee's statement that "[t]he Secretary would be required to provide for exceptions and adjustments to take into account the special circumstances faced by sole community providers." S.Rep. 98–23 at 54, U.S.Code Cong. & Admin.News 1983, at 194. Far from calling upon the Secretary to consider the "special circumstances" of each applicant for SCH status, see Appellant's Opening Brief at 31, the committee was referring simply to the special circumstances of sole community providers *as a group,* in order to explain Congress's decision to require SCH exemptions for the first time.

## II

Clinton also argues that the Secretary's statement of the basis and purpose of the regulation was inadequate, particularly in failing to offer any explanation for the regulation's 15–, 25–, and 50–mile thresholds, or for its premise that market-share data are relevant for hospitals located 25.1 miles from the nearest like facility but not for ones located 24.9 miles from the nearest like facility. This omission, says Clinton, renders the regulation arbitrary and capricious and also violates the explicit requirements of the Administrative Procedure Act. See 5 U.S.C. §§ 553, 706.

Clinton seeks to portray the Secretary's regulations as a "departure from past policy or practice" presenting a greater-than-usual need for explanation. Cf. *Simmons v. ICC,* 829 F.2d 150, 156 (D.C.Cir.1987). But the fact that an agency rule represents a change in course simply requires courts to make sure that "prior policies are being deliberately changed, not casually ignored", *id.* (quoting *Greater Boston Television Corp. v. Federal Communications Comm'n,* 444 F.2d 841, 852 (D.C.Cir.1970)), and that the agency "has articulated permissible reasons for that change", *NAACP v. FCC,* 682 F.2d 993, 998 (D.C.Cir.1982). Here, Congress's overhaul of the Medicare program in 1983 and its decision to provide for the first time a statutory definition of "sole community hospital" gave the Secretary an obvious reason—perhaps an obligation—to revisit the SCH regulation. In addition, the Secretary made clear

that the prior method of determining SCH status was not disappearing through oversight; in response to a comment supporting the old method, the Secretary explained that "objective criteria" would promote uniformity and efficiency in handling SCH requests, and hence would "resolve many of the previous problems associated with SCH designations". 49 Fed.Reg. 234, 271/3 (1984) (statement accompanying final rule).

While the Secretary plainly provided adequate reasons for moving away from the old criteria, and for seeking more objective ones, the explanation of the new criteria was skimpy. In context, however, we believe we can "discern" the Secretary's path. That is enough. See *Bowman Transp. v. Arkansas–Best Freight System,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974); accord, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983).

Ironically, what tips the balance for us in this case is the extent to which the Secretary's regulations did *not* depart from past practice. Under the HCFA's 1974 Intermediary Letter, a hospital "generally" would not qualify for SCH treatment if it was within 25 miles of another like hospital. The Secretary carried the 25–mile criterion over from the prior practice; since this criterion was not new and apparently had stood the test of experience, the Secretary saw no special reason to justify it. Both below and above that divide, however, the Secretary had provided exceptions and now made their terms narrower and more explicit. While in each case the Secretary might have used other criteria to render the process more "objective", no one proposed either the use of other criteria (except for the old system) or any alternative way of securing more objectivity. The absence of any alternative proposals colors our assessment of the Secretary's explanation. Cf. *State Farm,* 463 U.S. at 48–51, 103 S.Ct. at 2869–71 (finding arbitrary and capricious agency's failure to explain rejection of an alternative that was "within the ambit of the existing Standard" and shown to rely on sound technology and to be effective).

Specifically, for hospitals such as Clinton, with a like hospital within 25 miles, the Provider Reimbursement Review Board had taken the HCFA's statement that hospitals within 25 miles of a like facility "generally" would not qualify for SCH treatment to mean that sometimes such hospitals *would* qualify, and hence that the distance criterion could never be assumed to be dispositive; instead, all applications had to be judged by a totality-of-the-circumstances test. See *Santa Ynez*, [1978 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 29,221. Indeed, the 1978 Intermediary Letter had appeared to call for across-the-board consideration of hospital admitting patterns. I.L. 78–17 (April 1978), [1978 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 28,972. In promulgating the new SCH regulations, the Secretary implicitly disapproved of such decisions, commenting that the prior "broad general program instructions" had "provided insufficient basis for defending the regional office decisions upon appeal". 49 Fed.Reg. at 271/3. In lieu of a flexible standard that would generally deny SCH status to hospitals within 25 miles of a like facility but that would take account of market share under some circumstances, the Secretary opted for a firmer rule that protected the twin goals of uniformity and administrative efficiency.

Clinton argues that the Secretary's failure to focus on admitting patterns completely ignored evidence supporting their consideration, especially a task force's conclusion that SCH status should turn entirely on whether the applying hospital accounts for at least 80 percent of all hospital admissions among residents of its service area. See *Report of Regional Administrators' Task Force on Sole Community Hospital Exemptions* (Feb. 28, 1983), in Joint Appendix 199, 212. But the GAO report that Clinton stresses elsewhere, see *supra* at 858, undermined this conclusion. According to the GAO,

> HCFA regional office and intermediary personnel we contacted stated that requesting providers often 'shrink' their service area in order to exaggerate the residents' dependence on them for care. For example, in one request we examined, the provider described its service area as having only a 10–mile radius, apparently because reducing the radius from 20 miles resulted in more than 80% of its service area residents using it for care.

*GAO Report.* Requiring hospitals to satisfy distance criteria before use patterns can come into play, and limiting the conditions under which they can come into play at all, obviously reduces the opportunity to engage in such manipulations. In addition, distance criteria seem the most natural way of implementing Congress's directive to base SCH determinations on a hospital's "isolated location" and the "absence of other hospitals".

Thus we are able to discern the Secretary's path, even though it is lighted more by the inherent structure of the regulations and by the failure of any rulemaking participants to suggest alternatives (other than the pre-amendment approach) than by any explicit reasoning of the Secretary.

## III

The remainder of Clinton's contentions are easily dealt with. Because we are upholding the Secretary's criteria for determining SCH status, and because Clinton concededly does not satisfy those criteria, we need not entertain Clinton's arguments that hospitals that *do* meet those criteria should be able to receive SCH treatment retroactively, rather than, as the Secretary decided, only 30 days after HCFA approval. 42 CFR § 412(b)(2) (1985).

Likewise, Clinton has nothing at stake in the new regulations' "grandfathering" provision, under which hospitals that had applied for their SCH exemptions before October 1, 1983 could keep the exemptions unless their circumstances had changed. *Id.* at § 412.-92(b)(4). While Clinton hints in passing that the grandfathering provision undercuts the Secretary's defense of the new SCH criteria and renders *them* arbitrary and capricious, see Appellant's Opening Brief at 48–49, we disagree; despite Clinton's protestations, the Secretary certainly is allowed to take administrative convenience into account, and we do not find the grandfathering provision fatal to the new SCH criteria. As for Clinton's claim that the grandfathering provision violates the Equal Protection Clause, it is unavailing for

the reasons given by the district court. 783 F.Supp. at 1440.

Accordingly, the judgment of the district court is

*Affirmed.*