**OMNIPOINT CORPORATION,**
**Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and the United States of America, Respondents.**

**GO Communications Corporation, et al., Intervenors.**

Nos. 95–1374, 95–1391, 95–1409 and 95–1412.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 28, 1995.

Decided March 8, 1996.

624

Mark J. Tauber, argued the cause, for petitioner Omnipoint Corp., with whom Emilio W. Cividanes and Mark J. O'Connor were on the briefs.

Keith J. Harrison, argued the cause, for petitioner QTEL Wireless, Inc., with whom Jeffrey W. King was on the briefs.

Eliot J. Greenwald, argued the cause, for petitioners New Wave LLC, et al., with whom John Q. Hearne and Mark D. Wilkerson were on the briefs.

Christopher J. Wright, Deputy General Counsel, Federal Communications Commission, argued the cause, for respondents, with whom William E. Kennard, General Counsel, Daniel M. Armstrong, Associate General Counsel, James M. Carr, Joel Marcus, and John P. Stern, Counsel, Federal Communications Com'n, and Anne K. Bingaman, Assistant Attorney General, and Robert B. Nicholson, Attorney, U.S. Department of Justice, were on the brief. John E. Ingle, Deputy Associate General Counsel, Federal Communications Commission, and Robert J. Wiggers, Attorney, U.S. Department of Justice, entered appearances, for respondents.

Ashton R. Hardy, argued the cause and filed the briefs, for intervenor Radiofone, Inc.

Edgar F. Czarra, Jr., argued the cause, for intervenors Cook Inlet Region, Inc., et al., with whom Harris Weinstein, Kurt A. Wimmer, Lawrence R. Sidman, Judith A. Mather, J. Roger Wollenberg, William R. Richardson, Jr., Lynn R. Charytan, George Petrutsas, Carl W. Northrop, Emmett A. Johnston, Shelley L. Spencer, Phyllis A. Whitten, David E. Springer, John C. Spinrad, Stephen G. Kraskin and Sylvia L. Lesse were on the brief. Jonathan D. Blake entered an appearance, for intervenor American PCS, L.P. Frederick M. Joyce entered an appearance, for intervenor Essex USA, LLC. David Cosson and L. Marie Guillory entered appearances, for intervenor Nat. Telephone Coop. Ass'n. Jonathan D. Hart entered an appearance, for intervenors BET Holdings, Inc., and Page Call, Inc. James L. Winston and Walter E. Diercks entered appearances, for intervenor Nat. Ass'n. of Black Owned Broadcasters, Inc. Debra M. Richards, pro se, entered an appearance. Thomas A. Hart, Jr., entered an appearance, for intervenor Nat. Paging & Personal Communications Ass'n.

Before EDWARDS, Chief Judge, and WALD and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge SENTELLE.

Opinion dissenting in part filed by Circuit Judge WALD.

SENTELLE, Circuit Judge:

In this consolidated proceeding, we consider three separate petitions for review of a Federal Communication Commission order. All petitioners allege that the Commission violated the APA and its own regulations in promulgating its *Implementation of Section 309(j) of the Communications Act—Competitive Bidding, Sixth Report and Order,* F.C.C. 95–301 (July 18, 1995) ("*Sixth R & O*"), which eliminated the gender- and race-based provisions of the Commission's C block auction rules for broadband PCS, but each petitioner also raises separate claims. One petitioner claims that the Commission's actions in eliminating the provisions were arbitrary

and capricious under 5 U.S.C. § 706(2)(A); one alleges that the Commission's actions discriminated against white males; and the third contends that the Sixth Report and Order violated § 309(j)(3)(B) of the Communications Act as it undermined the Commission's mandate to aid small businesses.

After reviewing the claims, we find that the Commission's actions were justified and did not violate the APA, the Commission's own regulations or its statutory mandate.

## I. BACKGROUND

Broadband PCS is a new type of wireless communication technology that will provide a variety of mobile telephone services in competition with existing cellular services. The FCC partitioned the broadband spectrum into six blocks, labeled A though F. It opted to allocate the spectrum in three separate auctions: the first auction was for licenses in blocks A and B; the second, for licenses in blocks C and F; and the third, for licenses in blocks D and E. We are concerned with the second auction here.

Blocks C and F were designated "entrepreneurs' blocks." Eligibility for these blocks was limited "to entities that, together with their affiliates and certain investors, have gross revenues of less than $125 million in each of the last two years and total assets of less than $500 million." *Implementation of Section 309(j) of the Communications Act—Competitive Bidding, Fifth Report and Order*, 9 F.C.C.R. 5532, 5585 ¶ 121 (1994) ("*Fifth R & O*"), on recon., *Fifth Memorandum Opinion and Order*, 10 F.C.C.R. 403 (1994) ("*Fifth M & O*"). The rules establishing the entrepreneurs' blocks were adopted by the Commission in order to satisfy 47 U.S.C. § 309(j)(3)(B), which mandated that the Commission promulgate rules that would "disseminat[e] licenses among a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women."

Broadband PCS is a highly capital intensive business. *See Fifth R & O* ¶ 174. As such, the primary impediment to participation by designated entities is a lack of access to capital. Accordingly, the FCC structured the auction rules to allow bidders in the entrepreneurs' blocks to obtain substantial investment from other companies.

It did this primarily in three ways. First, the FCC structured the attribution rules to allow those companies that were not allowed to bid on blocks C and F to invest in entities that bid on those blocks. Specifically, as much as 75% of the total equity of C block applicants could be held by as few as three passive nonvoting investors that would be too large themselves to bid in the entrepreneurs' blocks. Second, the Commission gave a 10% bidding credit, or discount off the bidding price, to small businesses. And third, successful bidders were given favorable installment terms.

Additionally, the Commission adopted rules designed to enhance opportunities for businesses owned by women and members of minority groups in an effort to comply with the directive of 47 U.S.C. § 309(j)(4)(D), which instructed the Commission to ensure that women and minorities have "the opportunity to participate in the provision of spectrum-based services." These rules provided the following benefits: (1) a woman- or minority-owned applicant could have a single passive non-voting investor with an interest as large as 49.9% if the applicant held a 50.1% interest ("49% equity option"); *Fifth R & O* ¶¶ 160–62; (2) a special exception to the affiliation rule allowed an individual member of a minority group to participate as a member of the control group of a minority-owned C block applicant even though the individual's other business properties would otherwise make the applicant too large for the entrepreneurs' block; *Fifth M & O* ¶¶ 40–41; and (3) minority- and women-owned businesses were to receive an additional 15% bidding credit, tax certificates and more favorable installment payment plans than other small businesses. *Fifth R & O* ¶¶ 130–47.

The A and B block auctions were held in March, 1995, and the C block auction was scheduled to take place in May, 1995. However, in February, Telephone Electronics Corporation (TEC) moved to stay the auctions, asserting that the FCC's race- and gender-based rules were unconstitutional.

On March 15, we granted a stay of "[t]hose portions of the [auction rules] establishing minority and gender preferences, the C block auction employing those preferences, and the application process for that auction." *Telephone Electronics Corp. v. FCC,* No. 95–1015, 1995 WL 364043 (D.C.Cir. March 15, 1995). We found that TEC had "demonstrated the requisite likelihood of success on the merits." *Id.* TEC later withdrew its petition for review, and this Court dissolved the stay on May 1. *Telephone Electronics Corp. v. FCC,* No. 95–1015 (D.C.Cir. May 1, 1995) (order granting dismissal of petition for review). The FCC then rescheduled the C block auction without revising its women-and-minority-based provisions.

On June 12, three days before the new due date for filing applications to participate in the C block auction, the Supreme Court announced its decision in *Adarand Constructors v. Pena,* —— U.S. ——, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). In that case, the Court ruled that strict scrutiny must be applied to all racially based government actions, holding that such actions "are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Id.* at ——, 115 S.Ct. at 2113.

In light of this decision, the Commission suspended the filing deadline for C block applications on June 13. Ten days later, the Commission released a Further Notice of Proposed Rulemaking in which it suggested modifications to the C block auction rules. *Implementation of Section 309(j) of the Communications Act—Competitive Bidding, Further Notice of Proposed Rulemaking,* F.C.C. 95–263 (released June 23, 1995) ("FNPRM"). Recognizing *Adarand* had made the C block rules subject to considerable legal uncertainty, the FCC "propose[d] to eliminate all race- and gender-based provisions contained in [its] competitive bidding rules ... in order to avoid delay caused by ... legal challenges." FNPRM ¶ 2.

Believing it was necessary to hold the C block auction as soon as possible, the Commission set a two-week deadline for filing comments and did not invite reply comments. On the same day that it issued the FNPRM,

the Commission also scheduled the C block auction for August 29, 1995, with short-form applications for the auction due July 28.

On July 18, the Commission issued its *Sixth R & O.* In this R & O, the Commission adopted most of the rule changes proposed in the FNPRM. It leveled all benefits upward, thereby making available to all small businesses the favorable terms that previously had been available only to small businesses owned by women and minorities. *See Sixth R & O* ¶¶ 18, 32, 35–48. The Commission ordered that the amended rules would take effect immediately upon publication in the Federal Register. *Id.* at ¶ 60. This occurred July 21, 1995. 60 Fed.Reg. 37786 (July 21, 1995).

Three days later Omnipoint Corporation, a small business that holds a PCS license for the New York Major Trading Area, petitioned this Court for review of the *Sixth R & O* and asked for an emergency stay. *Omnipoint Corp. v. FCC,* 78 F.3d 620 (1995). Omnipoint contended that the Commission had committed procedural violations of the Administrative Procedure Act (APA) and had violated the equal protection rights of white males by extending the 49% equity option to all bidders. On July 27, this Court issued a stay of this rule and ordered an expedited briefing schedule.

On August 2, QTEL Wireless, Inc., a minority-owned small business that had been prepared to participate in the PCS auction prior to the Commission's stay in June, filed a motion to expand this Court's review of the FCC's eligibility rules and to consolidate its action with the *Omnipoint* case. QTEL asked this Court to broaden its review to include the other substantive changes in the rules regarding women-and-minority-owned businesses, namely the bidding credit provisions, the special exception to the affiliation rule and the favorable installment plan terms. We granted QTEL's motion on August 8.

Shortly thereafter, a group of joint petitioners (New Wave LLC, Central Alabama Partnership L.P. 132 and Mobile Tri–States L.P. 130), all of which qualified as small

businesses under the FCC's rules, filed two separate petitions for review of the *Sixth R & O.* The joint petitioners contended that the changes, particularly the leveling upward of the special exception to the affiliation rule, violated the Commission's congressional mandate to ensure small businesses were provided an opportunity to participate in the PCS market. We consolidated these petitions with the *Omnipoint* case on August 18.

## II. STANDING

■ Before addressing the merits of this claim, we must first determine whether petitioners have standing to bring this suit. As we have stated previously, a plaintiff may secure constitutional standing if he can "show injury in fact that is fairly traceable to the defendant's action and is redressable by the relief requested." *Animal Legal Defense Fund, Inc. v. Espy,* 23 F.3d 496, 498 (D.C.Cir.1994); *see also Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982). A plaintiff may secure judicial review under the APA if he can demonstrate that the injuries he asserts fall within the "zone of interests" sought to be protected by a relevant statute. *Animal Legal Defense Fund, Inc.,* 23 F.3d at 499; *see also Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987).

■ Omnipoint complains that the 49% equity option, although facially neutral, is racially discriminatory as the Commission did not allow non-minority-owned small businesses adequate time to take advantage of the 49% option. As a result, Omnipoint argues that it cannot compete on an equal footing with minority- and women-owned businesses in the C block auction.

■ We hold that Omnipoint does have standing. Contrary to the intervenors' assertions, it is not necessary that Omnipoint be "able and ready" to utilize the 49% equity option in order to secure standing. Rather, when a party challenges a government set-aside program, "the 'injury in fact' . . . is the

denial of equal treatment resulting from the imposition of the barrier." *Northeastern Florida Chapter of the Assoc. Gen. Contractors v. Jacksonville,* 508 U.S. 656, 666, 113 S.Ct. 2297, 2303, 124 L.Ed.2d 586 (1993); *see also Adarand,* — U.S. at —, 115 S.Ct. at 2105 (citation omitted). Omnipoint's injury is its inability to compete equally in the C block auction if the 49% equity option is indeed racially discriminatory.

■ Joint petitioners claim to have standing under 5 U.S.C. § 702, which grants standing to those "aggrieved by agency action within the meaning of a relevant statute." We find that, as small businesses under the Commission's definition, joint petitioners are within the zone of statutorily protected interests of § 309(j), which was designed to promote opportunities for small businesses and prevent anticompetitive concentration of spectrum licenses in a few large companies. *See* 47 U.S.C. §§ 309(j)(3)(B) and 309(j)(4)(D).

Further, joint petitioners adequately allege injury by the affiliation rule adopted in the *Sixth R & O* as that rule allows major companies to participate in the C block auction and qualify for small business advantages, thereby reducing the likelihood that small businesses such as the joint petitioners will be able to outbid their competitors at auction.

■ QTEL also has standing to assert its claim. QTEL's investors allegedly withdrew their investments due to the Commission's notice of proposed rulemaking eliminating the minority and gender preferences. *See Declaration of Q.T. Kenan, President of QTEL Wireless* at ¶ 11. These changes were implemented in the *Sixth R & O.* Hence, QTEL suffered injury "traceable to the [Commission's] action" which is redressable by the relief requested. *Animal Legal Defense Fund, Inc.,* 23 F.3d at 498.

## III. MERITS

Having determined that petitioners have standing to litigate, we now address the merits of their claims.

## A. *QTEL's Claims*

### 1. *Did the FCC violate the APA?*

QTEL first alleges that the FCC violated the APA, 5 U.S.C. § 553, and the Commission's own statutory requirement, 47 C.F.R. § 1.415(c), by providing inadequate time for notice and comment, by making the final rule effective on the date of its issuance and by dispensing with reply comments in the rulemaking process. Omnipoint also raises the claim that the FCC violated the APA by making the final rule effective immediately upon publication, and both Omnipoint and the joint petitioners join QTEL in its claim that the Commission violated its own regulations by dispensing with reply comments.

██ The Commission published its proposal to eliminate the race- and gender-based provisions in the Federal Register on June 30, 1995. *Further Notice of Proposed Rulemaking,* 60 Fed.Reg. 34200 (proposed June 30, 1995). It established July 7, 1995 as the deadline for comments on the proposed changes. QTEL contends that this action violated the APA as the Commission failed to provide adequate time for notice and comment.

██ Reasonable notice of a proposed rulemaking shall be given, *Fund for Animals v. Frizzell,* 530 F.2d 982, 988 (D.C.Cir.1975); however, notice is not required "when the agency finds (and incorporates the finding and a brief statement of the reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). Notice is adequate if it provides "interested persons an opportunity to participate in the rule making through submission of written data, views or arguments." 5 U.S.C. § 553(c).

Here, the Commission "compl[ied] with the strict language of section 553" as it gave interested parties notice of its proposed rules and provided public procedures for comment in the FNPRM. *Fund for Animals,* 530 F.2d at 988. QTEL contends, however, that this "strict compliance" was inadequate. It asserts that, because of the magnitude of the changes proposed by the Commission, the time provided here did not allow for meaningful public comment.

We disagree with this proposition, however, and find that the comment period provided by the FCC was sufficient given the "urgent necessity for rapid administrative action under the circumstances." *Northwest Airlines v. Goldschmidt,* 645 F.2d 1309, 1321 (D.C.Cir.1981). These circumstances included a congressional mandate to implement the C block auction "without administrative or judicial delays;" 47 U.S.C. § 309(j)(3)(A); *see also Florida Power & Light Co. v. United States,* 846 F.2d 765, 772 (D.C.Cir.), *cert. denied,* 490 U.S. 1045, 109 S.Ct. 1952, 104 L.Ed.2d 422 (1988) (holding that fifteen-day comment period was adequate given Congressional deadline imposed on Nuclear Regulatory Commission); *Petry v. Block,* 737 F.2d 1193, 1200–01 (D.C.Cir.1984) (holding that the limited time Congress gave the Department of Agriculture was a "crucial factor in establishing 'good cause'" under § 553(b)(B)); preservation of the interests of small businesses, minorities and women that Congress sought to protect through § 309(j); and preservation of a viable market for C block licenses. In its *Sixth R & O,* the Commission specifically found that existing business relationships were more likely to survive if the auction was not significantly delayed. *Sixth R & O* ¶ 8. Also, it noted that delay of the C block auction would postpone competition in the wireless marketplace, thereby harming the ability of latter entrants to compete. *Id.* at ¶ 7. We find no reason to disagree with these findings, and hold that they were sufficient to justify the shortened comment period provided by the Commission in this case.

Additionally, we note that, contrary to QTEL's assertions, interested parties actually had more than seven days in which to file comments as notice of the proposed agency action was given prior to July 30. In *Fund for Animals,* we found that the short comment time provided by the Fish and Wildlife Service (FWS) was reasonable as the appellants had actually received notice prior to the August date when the proposed federal regulations were published in the Federal Register. *Fund for Animals,* 530 F.2d at 989–90.

**630**

We held that public statements issued by the FWS in May and June had provided notice to appellants of the proposed action of the agency, noting that "[i]t is a vital part of appellants' business to be knowledgeable in [their] field." *Id.* at 990.

Here, the Commission published a public notice on June 13 announcing suspension of the filing deadline for applications to participate in the C block auction. Also, the FNPRM was issued by the Commission on June 23, seven days before its June 30 publication in the Federal Register. Hence, like the petitioners in *Fund for Animals,* the parties in this case received notice of the proposed agency action prior to June 30 and, therefore, had more than seven days in which to comment on the proposed rule.

In addition, we find petitioners and intervenors were not harmed by the short comment period. *See* 5 U.S.C. § 706 (providing that reviewing court take "due account ... of the rule of prejudicial error"). The Commission received 45 comments and 42 letters addressing its proposed rule, the majority of which supported the FCC's effort to commence the auction quickly and avoid litigation by leveling up. It also reviewed the comments received and took them into account in its decision. In fact, the Commission modified one of the proposed rules in response to the comments filed. *Sixth R & O* ¶ 32; *see also Florida Power & Light,* 846 F.2d at 772 (rejecting claim that a comment period was inadequate where comments were filed, were considered by the agency, and affected the final rule). Further, QTEL has since had a considerable period of time to consider the rule, but has failed to identify any substantive challenges it would have made had it been given additional time. *See id.; Air Transport Ass'n of America v. Civil Aeronautics Board,* 732 F.2d 219, 224 n. 11 (D.C.Cir.1984) (finding harmless error where petitioner "[did] not explain what it would have said had it been given" an opportunity to respond).

QTEL and Omnipoint also claim that the Commission violated the APA by making the final rule effective immediately upon publication. A rule is to take effect "not less than 30 days" after its publication

unless good cause is found by the agency and published with the rule. 5 U.S.C. § 553(d)(3). In determining whether good cause exists, an agency should "balance the necessity for immediate implementation against principles of fundamental fairness which require that all affected persons be afforded a reasonable amount of time to prepare for the effective date of its ruling." *United States v. Gavrilovic,* 551 F.2d 1099, 1105 (8th Cir.1977).

In the *Sixth R & O,* the Commission stated that good cause existed to have the rules take effect immediately as "the C block auction for broadband PCS [wa]s scheduled to commence on August 29, 1995, and initial short-form applications [wer]e due July 28, 1995." *Sixth R & O* ¶ 60. The Commission found it was necessary for the revised rules to take effect prior to the due date of the short-form applications "in order to avoid the delays and litigation risks associated with prior rules." *Id.*

Petitioners contend that this tight deadline problem was of the Commission's own making; hence, any need for expedition was simply "bootstrapping" by the Commission. We disagree, however, and find that a number of factors justified the need for expedition, not simply the August 29 auction date.

First, as we noted above, the Commission was under a congressional deadline to act quickly. Second, the precarious nature of the financial investments of prospective C block bidders, as well as the headstarts already given to the A and B blocks as a result of the litigation delay, also supported an expedited proceeding. *See Sixth R & O* ¶¶ 1, 7. And third, a delay in the C block auction would undermine the public interest by delaying additional competition in the wireless marketplace. *Id.; see also Buckeye Cablevision, Inc. v. FCC,* 387 F.2d 220, 228 n. 34 (D.C.Cir.1967) (holding that Commission's desire to minimize harm to public was sufficient "good cause" to make rule effective on date of publication in Federal Register).

Additionally, the purpose of the thirty-day waiting period is to give affected parties a reasonable time to adjust their behavior before the final rule takes effect. *See*

*American Federation of Government Employees v. Block*, 655 F.2d 1153, 1156 (D.C.Cir.1981). In its comments requesting the stay, Omnipoint argued that it needed at least 60–90 days to adjust to the rule change. *Comments of Omnipoint Corp.*, July 7, 1995, at 2. We find that, although the Commission did not allow much time for affected parties to adjust to the new rules, the stay and the delay caused by this litigation have afforded parties like Omnipoint the time they claimed to need to make this adjustment.

### 2. Did the FCC violate its own regulations?

 QTEL, Omnipoint and the joint petitioners also claim the Commission violated its own regulations because it did not request reply comments. The Commission's regulations provide that a reasonable time will be provided for filing reply comments. 47 C.F.R. § 1.415(c). The Commission may waive its own rules, however, "for good cause shown." 47 C.F.R. § 1.3. Good cause exists where "particular facts would make strict compliance inconsistent with the public interest." *Northeast Cellular Telephone Co., L.P. v. FCC*, 897 F.2d 1164, 1166 (D.C.Cir.1990) (citing *WAIT Radio v. FCC*, 418 F.2d 1153, 1159 (D.C.Cir.1969), *cert. denied*, 409 U.S. 1027, 93 S.Ct. 461, 34 L.Ed.2d 321 (1972)). We review an agency's interpretation of its own regulation under a standard "more deferential ... than that afforded under *Chevron*." *National Medical Enterprises v. Shalala*, 43 F.3d 691, 697 (D.C.Cir.1995). "[P]rovided an agency's interpretation of its own regulation does not violate the constitution or a federal statute, it must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Id.* (quoting *Stinson v. United States*, 508 U.S. 36, 45, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993) (internal quotations and citations omitted)).

In the FNPRM, the Commission stated it was not requesting reply comments in order "to facilitate swift action on [its] rule changes." FNPRM ¶ 2. The Commission noted that it needed "to make such changes quickly in order to minimize the effects of the modified rules on existing business rela-

tionships" and to avoid further delaying "the expeditious dissemination of broadband PCS licenses to entrepreneurs." *Id.*

We find that the Commission's reasons constitute good cause and, therefore, hold that the Commission properly waived its reply comment provision. Contrary to petitioners' assertions, expedition of the rulemaking proceeding was necessary in order to reduce the harm resulting from delay. In April, potential applicants had informed the FCC that the *TEC* stay had had an immediately "chilling effect on potential lenders, investors and strategic partners ... [that was] detrimental to capital formation by [would-be C block participants]." *Comments on Emergency Petition for Waiver by Independent Cellular Consultants PCS, Inc.* at 7 (April 3, 1995). Additionally, another commenter noted that, in the wake of that stay, "the uncertainty and delay ... surrounding the entrepreneur block auctions ... caused potential financing sources to begin actively to considering other more secure investment opportunities." *Comments of DCR Communications, Inc.* at 2 (April 3, 1995). And most commenters to the FNPRM urged the Commission to proceed quickly. *See Sixth R & O* ¶¶ 10, 14, 27, 48.

 Petitioners assert, however, that, even if the Commission was justified in waiving the right to reply comments, its actions were still invalid under the APA as a second round of comment is necessary when an agency alters its course during the rulemaking proceeding. Here, the affiliation rule the Commission adopted in the *Sixth R & O* differed from the one it had proposed in the FNPRM.

 In deciding whether a second round of comment is required, this Court looks to see "whether the final rule promulgated by the agency is a 'logical outgrowth' of the proposed rule." *American Water Works Ass'n. v. EPA*, 40 F.3d 1266, 1274 (D.C.Cir.1994). A final rule is not a logical outgrowth of a proposed rule "when the changes are so major that the original notice did not adequately frame the subjects for discussion." *Connecticut Light and Power Co. v. Nuclear Regulatory Commission*, 673

F.2d 525, 533 (D.C.Cir.), *cert. denied,* 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982).

In the FNPRM, the Commission announced its tentative conclusion that "it would be imprudent to extend [that affiliation rule] exception to all entrepreneurs" as such a change would allow large wireless companies to dominate the C block auction. FNPRM ¶ 19. Several commenters suggested a solution to this problem, proposing that, in addition to extending the affiliation rule to all small businesses, the Commission should also require that the affiliates be under the applicable financial caps. They contended that this proposed rule would prevent the larger companies from being able to participate in the auction, but at the same time would protect the reliance interests of those companies currently utilizing the exception.

The Commission agreed with the commenters and adopted this proposal. The Commission asserts that this final rule was a "logical outgrowth" of the proposed rule as it was "a compromise between the rule that was tentatively proposed and the rule that was tentatively rejected."

We agree with the Commission that this final rule was a "logical outgrowth" of the issue as framed in the FNPRM. The Commission acted well within its authority when it chose to modify the affiliation exception based on comments responding to the FNPRM rather than to eliminate it. *See United Steelworkers of America, AFL–CIO–CLC v. Marshall,* 647 F.2d 1189, 1221 (D.C.Cir.), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981) ("[A] final rule may properly differ from a proposed rule ... when the record evidence warrants the change."). The commenters' solution to this problem allowed the Commission to adopt a rule that was actually more consistent with both the Commission's desire to avoid disrupting the existing plans of prospective auction participants and its overall approach of leveling benefits upward in order to remove the rules' race and gender preferences than the Commission's earlier version. Further, the "public interest in expedition and finality" in this case outweighed the advantages of additional comment. *Action Alliance of Senior Citizens of Phil. v. Bowen,* 846 F.2d 1449, 1455–56 (D.C.Cir.1988), *cert. denied,* 502 U.S. 938, 112 S.Ct. 371, 116 L.Ed.2d 323 (1991).

### 3. Were the FCC's actions arbitrary and capricious?

 QTEL contends that the Commission's action in eliminating the race- and gender-based provisions was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A), as these modifications were not supported by evidence in the record. An agency's decision is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). Under the arbitrary and capricious standard, the scope of review is narrow, and we are "not to substitute [our] judgment for that of the agency." *Id.; see also Atlantic Tele–Network, Inc. v. FCC,* 59 F.3d 1384, 1388 (D.C.Cir.1995). Our "duty is to ensure that the Commission has examined the relevant data and articulated a satisfactory explanation for its action...." *Atlantic Tele–Network, Inc.,* 59 F.3d at 1389 (quoting *Florida Cellular Mobil Communications Corp. v. FCC,* 28 F.3d 191, 197 (D.C.Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1357, 131 L.Ed.2d 215 (1995) (internal quotation and citation omitted)). Applying this deferential standard, we conclude that the Commission's action survives review.

After *Adarand,* the Commission had three alternatives: (1) it could retain the option and attempt to justify it under *Adarand;* (2) it could level the 49% equity option upward; or (3) it could eliminate the option. Given those alternatives, the Commission decided to level the benefits upward.

 QTEL contends that the Commission acted unreasonably when it elected not to attempt to defend its original rules after *Adarand.* We disagree. The Commission reasonably believed that justifying the old rules under "strict scrutiny" would have been difficult and time-consuming. Only last March, we stayed the C block auction, find-

ing TEC had demonstrated the "requisite likelihood of success on the merits" in its claim that the Commission's race-and-gender-based rules were unconstitutional. The possibility of further delay due to additional litigation if the Commission retained the race-based rules was great. As we have noted previously, an agency may properly consider the avoidance of litigation-related delay when revising its rules. *See, e.g., Florida Cellular Mobil Communications Corp.,* 28 F.3d at 196–98; *Office of Communication of United Church of Christ v. FCC,* 707 F.2d 1413, 1435–37 (D.C.Cir.1983).

Further, the Commission, although not conceding that the rules would not withstand strict scrutiny, did state that it did not believe the rules would withstand such scrutiny without the taking of additional evidence. *See Sixth R & O* ¶ 11. In light of the significant delays this would require, the Commission justifiably rejected this option. Hence, we hold that the Commission did not act unreasonably when it opted not to defend its race- and gender-based rules in light of *Adarand,* but rather, sought to commence the auction quickly and avoid litigation by leveling benefits upward.

Also, we find the Commission's decision to level the benefits upward rather than downward was justified. By selecting this option, the Commission avoided any issue under *Adarand,* and yet complied with the congressional directive to create opportunities for small businesses and for women- and minority-owned businesses to participate in the PCS market. As the Commission explained, expanding this option to all applicants would benefit all bidders by giving them added flexibility in acquiring capital, a factor that would be critical to a potential bidder's success in the C block auction.

QTEL contends that expansion of the 49% equity option to include all applicants will lead to *de facto* transfers of control, thereby allowing large companies to participate in the C block auction. Significant safeguards exist within the rules, however, to protect against such "shams." For example, qualifying entities must still maintain *de facto* and *de jure* control of the business, and the agency has an opportunity to review the entity's struc-

ture during the application process. *See* 47 C.F.R. § 24.720(k); *Fifth R & O* ¶ 117; *Fifth M & O* ¶¶ 128–29; *Sixth R & O* ¶ 17.

Also, the Commission properly weighed the reliance interests of affected parties when it extended the 49% equity option to all potential applicants. *See National Ass'n of Independent Television Producers and Distributors v. FCC,* 502 F.2d 249, 255 (D.C.Cir. 1974) (holding that the Commission was required to take into account petitioners' justifiable reliance upon old rule when enacting new rule). Eliminating the rule would have harmed many of the small, minority- and female-owned businesses which could not have otherwise attracted capital. QTEL is the only small, minority-owned business that has claimed to have lost investors because of the Commission's change in rules post-*Adarand.* Nothing in the record, however, suggests that QTEL's experience mirrored the situation others faced. In fact, intervenors supporting the Commission argued just the opposite.

*4. Did the FCC violate its governing statute?*

■ QTEL also complains that the modified C block auction rules conflict with the Commission's governing statute which instructed the Commission to "ensure that small businesses, rural telephone companies, and businesses owned by members of minority groups and women are given the opportunity to participate in the provision of spectrum-based services, and, for such purposes, consider the use of tax certificates, bidding preferences, and other procedures." 47 U.S.C. § 309(j)(4)(D). QTEL asserts that, as the Commission was acting contrary to congressional intent when it eliminated the race- and gender-based preferences in the *Sixth R & O,* no deference must be shown to the Commission's interpretation of the statute. *See American Federation of Gov't Employees, Locals No. 214 v. Federal Labor Relations Authority,* 798 F.2d 1525, 1528 (D.C.Cir.1986).

We find this argument meritless as the amended rules are entirely consistent with the Commission's statutory obligations. The Commission complied with § 309(j)(4)(D) by

considering the use of tax certificates, bidding credits and other procedures for the C block auction. *See Time Warner Entertainment Co. v. FCC,* 56 F.3d 151, 175 (D.C.Cir. 1995) (holding that when a statute by its terms requires the Commission to consider certain factors "[t]hat means only that [the FCC] must 'reach an express and considered conclusion' about the bearing of a factor, but is not required 'to give any specific weight' to it." (internal citations omitted)). Additionally, the modified rules will incidentally benefit businesses owned by women and minorities as many such businesses will qualify as small businesses. *See* FNPRM n. 39 (according to U.S. Census Data, "approximately 99% of all women-owned businesses and 99% of all minority-owned businesses generated net receipts of $1 million or less").

### B. Omnipoint's Claims

■■■■■■ Omnipoint contends that the rule would have a racially discriminatory effect as the time given non-minority, male-owned businesses to take advantage of the 49% equity option was significantly less than that provided to women and minority-owned businesses. It asserts that the amount of time provided was insufficient for businesses owned by white males to utilize the option. It argues that this regulation, even though facially neutral, must be invalidated as it has a racially discriminatory intent or purpose. *See Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). Proof of an agency's intent includes "a clear pattern [of agency action], unexplainable on grounds other than race[;] ... [t]he historical background of the decision[;] ... the specific sequence of events leading up to the challenged decision[; and] ... [d]epartures from the normal procedural sequence...." *Id.* at 266–67, 97 S.Ct. at 564.

Omnipoint cites several factors as evidence of the Commission's discriminatory intent. First, the C block auction rules were designed and justified as a measure to aid women and minorities, *Fifth R & O* ¶ 110, and in the *Sixth R & O* the Commission stated it was retaining the 49% equity option in order to preserve "existing business relationships formed under [its] prior rules and in anticipation of the C block auction." *Sixth R & O* ¶ 1. Second, in adopting this new rule, the Commission departed from its normal rulemaking procedures as it offered no opportunity for reply comments and accelerated the time provided for notice and comment. Finally, non-discriminatory options were available to the Commission that would have achieved the same results as expanding the option to all businesses. For example, Omnipoint suggests the Commission could have eliminated the 49% exception and still held the auction as scheduled.

We disagree with Omnipoint's contentions, and find the regulation nondiscriminatory in both purpose and effect. As we stated above, we believe that the Commission properly took into account the reliance interests of affected parties when it decided to retain the 49% equity option and expand it to all potential applicants. Contrary to Omnipoint's contentions, that the Commission considered the effect a rule change would have on minority-and-women-owned businesses does not evince its discriminatory intent.

In addition, we find that the rulemaking proceeding was shortened in order to preserve the business relationships of all potential bidders, not just women and minorities. Indeed, most commenters urged the Commission to move quickly in order to avoid additional delay in the C block auction, including many non-minority, male-owned entities. As the Commission noted, opposition to the race and gender neutral rules came not from non-minorities and males, but rather, from women and minorities.

We also find that the Commission reasonably concluded that the petitioners and others like them had sufficient time to take advantage of the 49% equity option. As evidence of this, we note that at least one white male-owned business adjusted to the rule change in the time provided. In addition, parties wishing to utilize this option are not required to do so before the auction, but may convert to this structure at any time. *See* 47 C.F.R. § 1.2105(c)(4)(i).

*C. Joint Petitioners' Claims*

The joint petitioners also assert that the affiliation rule adopted by the Commission violates § 309(j)(3)(B) of the Communications Act, which states that, in designing auction procedures, the Commission shall seek to promote "economic opportunity and competition ... by disseminating licenses among a wide variety of applicants, *including small businesses.*" (emphasis added). The joint petitioners contend that by making the affiliation rule race- and gender-neutral the Commission undermined its statutory mandate to aid bona fide small businesses as this change allows major companies to qualify as small businesses by simply forming new commonly owned corporations to be the applicant. Arguing that this rule is inconsistent with the Commission's governing statute, petitioners assert that it is beyond the agency's discretion and may be reversed and remanded without the normal deference accorded to an agency by the reviewing court. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

We must first determine whether the joint petitioners are barred from raising this issue. Although they concede that they failed to raise this issue before the Commission, they contend that they were barred from doing so as the Commission stated in the FNPRM that it was not inviting reply comments. They assert that any attempt to raise the issue after issuance of the *Sixth R & O* would have been futile as the auction was to commence August 29, a few days after the statutory time period for filing petitions for reconsideration.

As a general rule, claims not presented to the agency may not be made for the first time to a reviewing court. *See United States v. L.A. Tucker Truck Lines,* 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952). Section 405 codifies this requirement by requiring parties to petition the FCC for rehearing before raising a new issue on judicial review. 47 U.S.C. § 405(a). This Court has construed § 405 to require that complainants give the FCC a " 'fair opportunity' to pass on a legal or factual argument" before coming to court. *Washington Ass'n for Television and Children (WATCH) v. FCC,* 712 F.2d 677, 680–82 (D.C.Cir.1983) (citation omitted); *see also City of Brookings Mun. Tel. Co. v. FCC,* 822 F.2d 1153, 1163 (D.C.Cir.1987). Because section 405 also contains the "traditionally recognized exceptions to the exhaustion doctrine," a reviewing court may consider arguments where issues by their nature could not have been raised, or would have been futile, to raise before the agency. *WATCH,* 712 F.2d at 682; *accord Office of Communication of the United Church of Christ v. FCC,* 779 F.2d 702, 706–07 (D.C.Cir.1985).

We agree with the joint petitioners that attempting to raise this issue before the Commission would have been futile as the Commission was rapidly expediting the proceeding and appeared "wedded to the procedures that it had employed." *City of Brookings Mun. Tel. Co.,* 822 F.2d at 1163. Any changes in the rule after the issuance of the *Sixth R & O* would have almost certainly resulted in a delay, inconsistent with the Commission's shortened timeline. Hence, this issue is properly before us for review. However, on the merits of the issue, we hold for the Commission.

Although § 309 does not define "small businesses," the Commission in its original C block rules defined small businesses as those with "a net worth not in excess of $6 million with average net income after Federal income taxes for the two preceding years not in excess of $2 million." *Fifth R & O* ¶ 172. In 1994, the Commission raised the small business threshold for broadband PCS to the $40 million gross revenues standard, recognizing that "in certain telecommunications industry sectors, [the prior] limit may not be high enough." *Id.* The rules contained an exemption for minority-owned businesses, which were allowed to ignore the gross revenues of their affiliates. *Fifth M & O* ¶¶ 40–41. In its *Sixth R & O,* the Commission expanded this exemption to include all small businesses, provided the annual gross revenue of such affiliates was below $125 million and the total assets of all such affiliates was below $500 million. *Sixth R & O* ¶ 32.

The joint petitioners argue that the Commission did not adequately justify this expansion, noting that there is no rational connection between the Commission's actions and the purpose of § 309(j), which is to provide opportunities for small businesses to participate in the auction for spectrum-based services. They disagree with the Commission's proffered justification—that the capital requirements of the PCS business are so large that they required the extension of the affiliation rule to companies with greater assets and revenues—and contend that the original $40 million standard was adequate, noting that in the *Fifth R & O* the Commission found "there [was] substantial support in the record for [this] standard." *Fifth R & O* ¶ 175. The joint petitioners allege that this change will harm small businesses owned by women and minorities as 99% of these businesses have revenues below $1 million. *Sixth R & O* at ¶ 8 n. 29.

The joint petitioners also contend that no support exists in the record for finding that elimination of the rule rather than its expansion would have upset established business relationships. They note that large companies with assets between $40 to $125 million could still have participated in the C block auction if the exception had been eliminated. The only difference would be that such firms would not qualify as small businesses and, therefore, would not receive the small business benefits.

We hold that the Commission did not violate § 309(j) by modifying the affiliation rule. Nothing in the statute prohibited the Commission from extending additional benefits to companies whose affiliates have gross revenues up to $125 million, and the Commission adequately justified the extension of the rule. Prior to the A and B block auctions, the Commission stated: "We expect broadband PCS to be a highly capital intensive business requiring bidders to expend tens of millions of dollars to acquire a license and construct a system even in the smaller broadband PCS markets." *Fifth R & O* ¶ 174. The Commission's experience with the A and B block auctions confirmed this prediction as even large telecommunication companies did not bid on their own but joined together as partnerships.

By making a limited affiliation exception available to a broader range of businesses, the FCC created an additional vehicle for small businesses to pool their resources. Recognizing the benefits of pooling, the FCC determined that

> all small businesses, including those owned by minorities and women, should not be precluded from pooling their resources in this capital intensive service.... In addition, small businesses experienced in managing smaller businesses should not be penalized because they own or are otherwise affiliated with other businesses whose assets and revenues must be considered on a cumulative basis and aggregated for purposes of qualifying for the C block auction.

*Sixth R & O* ¶ 32. Thus, modification of the affiliation rule aids participation by small businesses in the C block auction by providing an additional means for small businesses to meet their financial needs. We find it entirely reasonable for the Commission to extend an additional advantage to more companies that qualified to bid in the entrepreneurs' blocks. We also note that companies with gross revenues of $40 million or less retain significant advantages, including the ability to form consortia with other small businesses. 47 C.F.R. § 24.720(b)(3).

In addition, elimination of this provision would have harmed many of the minority-owned businesses that had been relying upon the rule. *See International Union, United Auto., Aerospace & Agric. Implement Workers of America v. Brock*, 783 F.2d 237, 248 (D.C.Cir.1986) (noting that the public justifiably relies upon administrative agencies' rules and interpretations). Here, a bidder who had been relying on the 49% equity option would have an established business relationship with only one investor and would have to find new investors in order to convert to the 25% equity structure. In contrast, a bidder who had been relying upon the 25% structure would have relationships with a number of investors, one of whom might be willing to take advantage of the 49% investment option. Thus, the Commission reason-

ably decided to "cap" the affiliation exception and make it race-neutral.

## IV. CONCLUSION

We conclude that the Commission did not violate the APA or its own regulations by providing a shortened period for notice and comment, by making the rule effective immediately and by dispensing with reply comments in the rulemaking process. In addition, we find the Commission, in adopting rules that eliminated race- and gender-based preferences by leveling benefits upward, did not act arbitrarily and capriciously in violation of 5 U.S.C. § 706(2)(A); did not discriminate against white males; and did not violate its statutory mandate to aid small business under § 309(j)(3)(B). Hence, we uphold the Commission's *Sixth R & O.*

WALD, Circuit Judge, dissenting in part:

Although I concur with most of the panel's analysis regarding the Federal Communications Commission's ("FCC") *Sixth Report & Order,* I believe that the FCC failed to provide the reasoned explanation for its decision to expand the 49% equity option to include all C block applicants which is required by § 706(2)(A) of the Administrative Procedure Act ("APA").[1] Accordingly, I would vacate those portions of the *Sixth Report & Order* which expand the 49% option and remand to the FCC to provide, if it can, an adequate explanation of why it abandoned its earlier position that extending the 49% option to all qualifying applicants would permit larger companies to circumvent the C block financial caps.

In authorizing the auction of spectrum licenses, the Communications Act directs the FCC to promulgate regulations which promote the goal of "disseminating licenses among a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women." 47 U.S.C. § 309(j)(3)(B) (1988). As the majority acknowledges, the Commission also recognized that in order to compete successfully in the

broadband personal communication services ("PCS") market, small businesses would require amounts of capital usually accessible only to larger companies. *See* Majority opinion ("Maj. op.") at 626. In the first set of rules issued by the FCC governing the C block auction, the Commission determined that it could best achieve a balance between these two objectives—preserving opportunities for small and minority- or women-owned businesses to participate in the PCS market, and permitting small businesses to obtain significant investment from larger entities— by allowing up to three large investors to hold passive, nonvoting equity blocks of up to 25% each in a qualifying entity (the "25% equity option"). The Commission explained that

> the 25 percent limitation on equity investment interests will serve as a safeguard that the very large entities who are excluded from bidding in these blocks do not, through their investments in qualified firms, circumvent the gross revenue/total asset caps. At the same time, it will afford qualified bidders a reasonable measure of flexibility in obtaining needed financing from other entities....

*Implementation of Section 309(j) of the Communications Act—Competitive Bidding, Fifth Report and Order,* 9 FCCRcd 5532, 5601–02 ¶ 159 (1994) (*"Fifth Report & Order"*), *on recon., Fifth Memorandum Opinion and Order,* 10 FCCRcd 403 (1994). To ensure that control over the C block licenses remained with the actual applicants, rather than with the larger companies who might utilize the 25% equity option to gain control of a C block license, the FCC stipulated that the control group in any small company exercising the 25% option must hold at least 25% of the equity, 50.1% of the voting stock, and all general partnership interests. *Id.* ¶ 158. The Commission also prohibited successful C block bidders from assigning or transferring their license to any other entity for three years, and from assigning or transferring it to an entity with income and assets over the

---

1. The APA directs a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capri-

cious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994).

C block financial caps for an additional two years. *Id.* ¶ 128.

For minority- and women-owned businesses, however, the FCC developed an additional option to help these entities surmount the more severe difficulties the Commission found they faced in attracting investment capital. Under this alternative, an entity with income and assets over the eligibility caps could own up to 49.9% of passive, non-voting equity in a minority- or women-owned business (the "49% option"). In support of this decision, the Commission explained that "women and minorities have especially acute problems in obtaining financing.... [T]o afford women and minority-owned businesses more flexibility in attracting financing, it is necessary to provide these entities with an alternative, somewhat more relaxed option regarding the attribution of revenues of passive investors." *Id.* ¶ 160.

Confronted with the inevitability of new legal challenges to the 49% option in the wake of the Supreme Court's decision in *Adarand*, the FCC decided to expand its availability to *all* eligible C block applicants, not just minority- and women-owned businesses, rather than delay the auction while the constitutionality of a restricted option was litigated. As the majority notes, the Commission explained in its order setting forth this change that expansion of the 49% option was preferable to either defending the *Fifth Report & Order* against a legal attack based on *Adarand*'s strict scrutiny principle or eliminating the option altogether; this middle course of action, the Commission thought, would avoid diminishing the value of the licenses through delay of the auction, and it would protect the deals struck by minority- and women-owned businesses and their investors in reliance on the original rules. *See* Maj. op. at 632–633; *Implementation of Section 309(j) of the Communications Act—Competitive Bidding, Further Notice of Proposed Rulemaking,* F.C.C. 95-263 (June 23, 1995) ¶¶ 7–10; *Implementation of Section 309(j) of the Communications Act—Competitive Bidding, Sixth Report and Order,* F.C.C. 95-301 (July 18, 1995) ("*Sixth Report & Order*") ¶ 11. In response to concerns expressed by commenters that this expansion might allow large companies to penetrate a significant proportion of the C block market, in contravention of congressional intent, the Commission answered:

> With respect to the *Control Group Minimum 50.1 Percent Equity Option,* we previously explained that in order to guard against abuses, the control group of applicants choosing this option must own at least 50.1 percent of the applicant's equity, as well as retain control and hold at least 50.1 percent of the voting stock. We have previously concluded that this requirement reduces substantially the danger that a well-capitalized investor with substantial ownership stake will be able to assume *de facto* control of the applicant.

*Sixth Report & Order* ¶ 17.

I do not take issue with the Commission's contention that defense of the original scheme or elimination of the 49% option entirely might have decreased the value of the licenses through delay or harmed C block applicants who had relied on the original rules. Both of these concerns may indeed be acceptable grounds for changing the substance of the original agency proposal. *See, e.g., Florida Cellular Mobil Communications Corp. v. FCC,* 28 F.3d 191, 196 (D.C.Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1357, 131 L.Ed.2d 215 (1995) (delay); *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 220, 109 S.Ct. 468, 477–78, 102 L.Ed.2d 493 (1988) (Scalia, J., concurring) (reliance on prior rule). My problem with the Commission's announced rationale for extending the 49% option to all small business applicants is rather this: in setting forth the initial auction rules, the Commission explicitly declined to extend the 49% equity option to all C block applicants because of its concern that even with the safeguards outlined above, the opportunity to make such a substantial investment in all C block entities, rather than just minority- and women-owned businesses, would allow large companies to exercise too much control over too many licenses that are targeted for small businesses. In its post-*Adarand* version of the auction rules, however, the Commission contends that expansion of the 49% option to include all C block applicants does not pose any such risk. By way of assurance, it asserts only that existing

restrictions on the 49% option—which are identical to those initially imposed on the 25% option—are now sufficient to protect against the dangers of big company capture they identified previously. I would like to know why the Commission is suddenly confident that if this expansion does produce a dramatic increase in penetration of the C block license market by large entities, as some of the petitioners claim it will and as the Commission previously worried it would, protection for the reliance interests of minority- and women-owned businesses will not have been secured at the expense of the FCC's statutory mandate to reserve this block of PCS licenses principally for small businesses. Because its about-face may have such significant consequences in determining the identity of those who hold these licenses, I believe the Commission needs to give a more thorough explanation for why it no longer worries about back-door control by bigger businesses.

I appreciate the concern expressed by my colleagues and the Commission regarding the potential effects of delay on the value of the C block auctions, and in these circumstances, the FCC might well have been justified in providing a less thorough rationale than usual for its change in course. But at a minimum, it should have explained why existing safeguards were sufficient to protect against excessive penetration by large companies, or it might have acknowledged the continuing threat of such penetration, but proposed to engage in heightened oversight to prevent this result. It has done neither. Even in the face of pressure for expeditious action, the APA's requirement that an agency must provide a "reasoned explanation" for its actions still applies. *See, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983) ("an agency rule would be arbitrary and capricious if the agency has ... entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency"); *Florida Cellular Mobil Communications*, 28 F.3d at 196 ("the fact that an agency rule represents a change in course simply requires courts to make sure that prior policies are being deliberately changed, not casually ignored, and that the agency has articulated permissible reasons for that change" (quoting *Clinton Memorial Hosp. v. Shalala*, 10 F.3d 854, 859 (D.C.Cir. 1993)). If this requirement is to have any meaning, I believe we are obliged to remand those portions of the FCC's *Sixth Report & Order* which expand the 49% equity option so that the agency may explain how its original fears of big business control have been assuaged or countermanded.