# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued February 11, 2026        Decided June 5, 2026

No. 25-1098

TREVOR KITCHEN,
APPELLANT

v.

COMMODITY FUTURES TRADING COMMISSION,
APPELLEE

---

Appeal of an Order of the
Commodity Futures Trading Commission

---

*F. Franklin Amanat* argued the cause and filed the briefs for appellant.

*Raagnee Beri*, Senior Assistant General Counsel, U.S. Commodity Futures Trading Commission, argued the cause for appellee. With her on the brief was *Anne W. Stukes*, Senior Assistant General Counsel.

Before: HENDERSON, CHILDS and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Trevor Kitchen (Kitchen) appeals the final orders of the Commodity Futures Trading Commission (CFTC or Commission) denying his application for a whistleblower award. His application relates to five successful enforcement actions the Commission brought against banks whose traders manipulated benchmark rates in the foreign currency exchange market. Kitchen alleges the Commission's denial of his application was arbitrary and capricious but, contrary to his allegation, the enforcement actions were not based on conduct about which he provided specific, credible and timely information. *See* 17 C.F.R. § 165.2(i)(1). In addition, there is no evidence he was the original source of information on which the Commission did rely. *See id.* § 165.2(*l*). Accordingly, we affirm the orders.

## I. Background

Kitchen traded within the foreign currency exchange (FX) market for many years. The FX market enables traders "to buy, sell, exchange and speculate on currencies." Record on Appeal (ROA) 965. Traders aim to profit by forecasting which currencies will increase or decrease in relative value.

The most common type of FX instrument is "spot" trading, which involves "immediate delivery of and payment for the product." CFTC, *Futures Glossary*, https://www.cftc.gov/ LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/inde x.htm [https://perma.cc/88QV-R9ZF] (last visited Apr. 28, 2026). The exchange rate at any given moment is the "spot price." *Id.* In addition to setting the rate for real-time transactions, spot prices are used to determine (or "fix") "benchmarks" on which traders base the valuation of other instruments in the FX market.

Benchmarks are based on an evaluation of spot prices over a set period of time (the "fix period"). ROA 966. For the most

popular currencies—including the U.S. dollar (USD) and pound sterling (GBP)—benchmarks are issued every half-hour as "the median of all trades in a minute-long period starting 30 seconds before the beginning of each half-hour." ROA 1134. For less popular currencies, the rates are issued every hour using a similar process.

The World Market/Reuters Closing Spot Rates (WM/R Rates) are some of the most popular benchmarks. WM/R Rates are based primarily on data from platforms that large banks use to execute their FX instruments. *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 587 (S.D.N.Y. 2015). The most frequently referenced WM/R Rate is the one set at 4:00 p.m. London time ("4 p.m. WM/R fix").

From 2008 to 2011, Kitchen used an FX trading platform operated by the Oanda Corporation (Oanda) to conduct his transactions. Through his account, Kitchen traded the USD, GBP and euro (EUR) against the Swiss franc (CHF) thousands of times. In August 2011, Kitchen allegedly "observed a precipitous drop in the values of the GBP, USD, and EUR[] . . . relative to the CHF" and thought "that the size of the drop in the affected currencies could only have been the result of collusion among market makers." ROA 18–19. He notified a variety of regulators, including the CFTC, of his surmise via email. The message read:

> It is my belief Oanda and its counterparts (banks and other FX traders[)] have together colluded to destroy Sterling and the US Dollar using the Swiss franc as the counterpart currency.
>
> To achieve this Oanda have utilised High frequency trading, various software programming and black box trading techniques

that simulate large trades that do not actually exist in real physical world. . . .

Only large banks with the assistance of FX traders using mathematical formulas, algorithms and logarithms . . . can accomplish this.

ROA 225.

CFTC staff determined Kitchen's "complaints were generalized unsupported claims that, beside the specific complaints about Oanda, were not actionable." ROA 1544. Focusing on the Oanda-related claims, it determined "[t]here was nothing in the account records to support [Kitchen]'s generalized allegations of market abuse and manipulation." ROA 1544. Ultimately, "the investigation was closed with no action." ROA 1545.

Nearly two years after Kitchen's initial contact with regulators, on June 12, 2013, the news outlet *Bloomberg* published an article alleging traders at several large banks were "rigging WM/Reuters rates." ROA 1132; Liam Vaughan, Gavin Finch & Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, Bloomberg (June 12, 2013, at 14:06 ET), https://www.bloomberg.com/news/articles/2013-06-11/traders-said-to-rig-currency-rates-to-profit-off-clients. According to *Bloomberg*, bank traders were colluding online to share information about client orders and concentrate the execution of those orders in order to manipulate the 4 p.m. WM/R fix up or down. *See In re Foreign Exch.*, 74 F. Supp. 3d at 587–88 (explaining these maneuvers). These actions enabled trades on the bank's own accounts to soar in value.

The CFTC says it was this *Bloomberg* article that caused it to open an investigation into five banks allegedly involved in the scheme in mid-June 2013. The article also sparked further media coverage. *Bloomberg* published a follow-up piece describing several other benchmark-rate manipulation schemes two days after its initial article. ROA 366–68; Lindsay Fortado, Ben Moshinsky & Jesse Hamilton, *Currency Rates Said to Face Global Regulation After Libor Review*, Bloomberg (June 14, 2013, at 21:01 ET), https://www. bloomberg.com/news/articles/2013-06-13/fx-rates-said-to-face-global-regulation-in-libor-review. Three days later, *International Business (IB) Times U.K.* published an article stating, "[a] whistleblower alerted regulators . . . in 2011 about some of the world's largest trading companies and banks manipulating benchmark . . . rates." ROA 391; Lianna Brinded, *FX Fixing Scandal Exclusive: Whistleblower Alerted US, UK and Swiss Authorities in 2011*, Int'l Bus. Times U.K. (June 17, 2013, at 14:10 BST), https://www.ibtimes.co.uk/fx-fixing-scandal-market-manipulation-whistleblower-cftc-479615. The alleged whistleblower was likely Kitchen.

In November 2013, while the CFTC's investigation was ongoing, Kitchen submitted a formal Tip, Complaint or Referral (TCR) Form in which he claimed to have observed "unprecedented currency manipulation through his personal trading activity and subsequent research and analysis." ROA 6. In February and March 2014, Kitchen submitted supplements with further allegations. The CFTC team investigating the FX benchmark manipulation was not aware of the information Kitchen had previously submitted to the Commission in 2011 until they saw his TCR. None of the information he provided—via email or TCR—was ever used by the benchmark investigation team.

The CFTC ultimately issued orders in five cases (Covered Actions) announcing settlement terms reached with the target banks.[1]  *See* ROA 963–1048.  Monetary penalties totaled $1.475 billion.  The Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010), instructs that the CFTC "shall pay an award or awards to 1 or more whistleblowers who voluntarily provided original information to the Commission that led to the successful enforcement of the covered judicial or administrative action, or related action."  *Id.* § 748, 124 Stat. at 1740 (codified at 7 U.S.C. § 26(b)(1)); *see also* 17 C.F.R. §§ 165.1–165.20 ("Whistleblower Rules").  Accordingly, the CFTC posted a notice on its website for each of the Covered Actions that invited individuals to apply for whistleblower awards.

Kitchen submitted an award application for the Covered Actions.  The CFTC Whistleblower Office notified Kitchen of its intent to recommend denial of his application and offered him the opportunity to submit additional information.  Kitchen accepted its offer.  The CFTC Claims Review Staff then made a preliminary decision to deny Kitchen's award claim.  Kitchen requested reconsideration.

Having not received the Commission's final decision after almost three years, Kitchen petitioned for mandamus relief in this Court.  Rather than responding to the petition, the Commission issued its final orders denying Kitchen's award application.  Kitchen then moved to dismiss his mandamus

---

[1] The banks were accused of violating sections 6(c), 6(d) and 9(a)(2) of the Commodities Exchange Act in connection with the benchmark manipulation scheme, which lasted from 2009 to 2012. ROA 971 (citing 7 U.S.C. §§ 9, 13(a)(2), 13b).

petition as moot and filed this appeal of the final orders. We have jurisdiction pursuant to 7 U.S.C. § 26(f)(2).

## II. Analysis

A whistleblower determination is made "in the discretion of the Commission." 7 U.S.C. § 26(f)(1). We review that decision under section 706 of the Administrative Procedure Act (APA). *Id.* § 26(f)(3). It will be set aside only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Nevertheless, the agency must . . . articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). If we review agency factfinding—as we do here—"there is no material difference between the APA's 'arbitrary and capricious' standard and its 'substantial evidence' standard." *Crooks v. Mabus*, 845 F.3d 412, 423 (D.C. Cir. 2016).

## A. Direct Original Source

Kitchen claims that he was the direct source of original information which led to the Covered Actions. He points to his 2011 emails and 2013 TCR as the relevant original information. To qualify for a whistleblower award, an applicant must have (1) "voluntarily provided . . . to the Commission," (2) "original information," which (3) "led to the successful enforcement of the covered judicial or administrative action . . . ." 7 U.S.C. § 26(b)(1); *accord* 17 C.F.R. § 165.5(a). "[F]ailure to satisfy any one of these statutory requirements dooms [a] whistleblower award

application." *Ross v. SEC*, 34 F.4th 1114, 1119 (D.C. Cir. 2022) (referencing identical SEC whistleblower provision). Only the third requirement is in issue here.

Subsection 165.2(i) of the Whistleblower Rules sets out the circumstances in which that requirement is satisfied. First, original information led to successful enforcement if it "was sufficiently specific, credible, and timely to cause the Commission" to open an investigation and if the Commission brought a successful administrative or judicial action (*i.e.*, a covered action) "based in whole or in part on conduct that was the subject of the whistleblower's original information." 17 C.F.R. § 165.2(i)(1). Second, if the whistleblower provided original information about conduct already under investigation, the information must have "significantly contributed to the success of the action." *Id.* § 165.2(i)(2). Third, a whistleblower may provide original information to an entity's "internal whistleblower, legal, or compliance" mechanism before or at the same time he provides it to the Commission so long as one of the other two scenarios is met. *Id.* § 165.2(i)(3). Kitchen submitted his initial 2011 email before the Commission began investigating FX benchmark manipulation so that the first circumstance applies.[2]

---

[2] An applicant must "provide[] the Commission original information in the form and manner that the Commission requires" under the Whistleblower Rules. 17 C.F.R. § 165.5(b)(1). The TCR is that required form. *Id.* § 165.3(a). Kitchen's 2013 TCR was submitted *after* the Commission had already opened an investigation into the conduct underlying the Covered Actions based on independent original information. *See infra* Part II.B. Thus, any original information in the TCR must meet the "significantly contributed" standard of paragraph 165.2(i)(2).

Kitchen argues the CFTC incorrectly applied 17 C.F.R. § 165.2(i)(1) to him. He asserts that his submissions "contained original information" that prompted the Commission to "open an investigation" and that the Covered Actions "must have dealt with the 'same conduct' as that reported by [him]." Appellant's Br. 46–47. The record does not support Kitchen's assertion in full. Although his original information did prompt an investigation, that investigation was unconnected to the Covered Actions.

Kitchen's allegations were sufficiently specific, credible and timely to cause the CFTC to investigate Oanda's alleged conduct. *See* ROA 1543–44 (noting the Commission opened an investigation upon receipt of Kitchen's email and conducted a review of records from Kitchen's Oanda account). His initial email—sent the same month that his concern arose—asserted that Oanda aimed "to destroy Sterling and the US Dollar using the Swiss franc as the counterpart currency." ROA 225. He later submitted data showing losses related to these currencies on his own account in order to corroborate the claim. He also described the suspected methods used to achieve the alleged manipulation: "High frequency trading, various software programming and black box trading techniques that simulate

The TCR, however, was a formalized version of Kitchen's earlier emails, which were sent *before* the Whistleblower Rules were promulgated. The Rules permitted applicants to bring their earlier tips into compliance after the Rules went into effect. *See id.* §§ 165.2(k)(5), 165.3(d). Because Kitchen did not submit his TCR "within 120 days of the effective date" of the Whistleblower Rules, however, he failed to comply. *Id.* Nevertheless, the Commission may waive any procedural requirements. 17 C.F.R. § 165.5(c). In addition, Kitchen "is not pursuing a Rule 165.2(i)(2) claim on appeal." Appellee's Br. 8 n.4.

large trades that do not actually exist in real physical world." ROA 225. These allegations in fact led to the opening of an investigation and thus were "sufficient" to do so under paragraph 165.2(i)(1).

To qualify for a whistleblower award, however, the Commission must also have brought a successful action "based in whole or in part" on the actions Kitchen identified. 17 C.F.R. § 165.2(i)(1); *see also* Whistleblower Incentives and Protection, 76 Fed. Reg. 53172, 53177 (Aug. 25, 2011) (noting a whistleblower's original information should have "a meaningful nexus to the Commission's ability to successfully complete its investigation"). That did not occur. The Oanda-focused investigation was "closed with no action." ROA 1545. And the conduct underlying the Covered Actions substantially differed from Kitchen's allegations.

The scheme Kitchen alleged is not the same as the one described in the Covered Actions. Oanda engaged in retail spot transactions. But the Covered Actions focused on benchmark, not spot price, manipulations. These fall within different features of the CFTC's enforcement jurisdiction. *Compare* 7 U.S.C. § 2(a)(1) (granting the CFTC jurisdiction of commodities), *and id.* § 1a(19) (defining "excluded commodity" to cover benchmark rates), *with id.* § 2(c)(2)(B)–(D) (granting the CFTC more limited jurisdiction of this retail FX market); *see* Oral Arg. at 17:55–18:55 (explaining that Kitchen's allegations were "perceived by the CFTC" to refer to "a different market" or "a different part of the agency's jurisdiction"). Kitchen argues his allegations regarding the manipulation of FX rates necessarily encompass manipulation of benchmarks. But these measures have different meanings. Spot prices are a real-time reflection of an exchange rate whereas benchmarks are reference rates set only periodically. Regardless, a mere implication of manipulation fails to meet

paragraph 165.2(i)(1)'s specificity requirement. *See* 17 C.F.R. § 165.2(i)(1). A covered action must have been brought "based in whole or in part on conduct that was the subject of the whistleblower's original information." *Id.* That action was never initiated based on Oanda's conduct. Thus, Kitchen's original information did not lead to a successful enforcement action.

Kitchen asserts his tips also included information about the banks' conduct which underlay the Covered Actions. Even if we read his submissions to allege manipulation by banks, the allegations are not nearly specific enough. His email referenced "counterpart[] []banks" with which Oanda may have been colluding, ROA 225, but there were no further specifics. Kitchen's tips did not reference any particular bank. Instead, Oanda was his focus. The subject line of his email read: "*OANDA* COMPLAINT OF MARKET ABUSE AND MANIPULATION." ROA 225 (emphasis added). He called on regulators to "investigate . . . companies *like Oanda*." ROA 226 (emphasis added). The data Kitchen submitted related to his Oanda account. Commission staff thought that Kitchen's tip was unhelpful because "its focus was on Oanda." ROA 1070; *see also* ROA 1579 (describing allegations unrelated to Oanda as "generalized" and "vague"). Thus, the CFTC's conclusion that Kitchen's tip did not lead to a successful enforcement was "reasonable and supported by the record." *Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1160 (D.C. Cir. 1980) (citation omitted).

Kitchen argues that "[t]here is no requirement that the whistleblower's allegation of wrongdoing be 100% correct or complete." Appellant's Br. 44. We of course recognize that a whistleblower does not always know the full picture of a scheme. But he must provide some actionable detail. *See* ROA 1579 ("[Kitchen's] complaints outside of the specific

allegations against [Oanda] were too generalized and therefore not actionable."). To the extent Kitchen provided information about the banks' conduct, it was not the type of "high quality," "specific[]" information the CFTC's whistleblower program is designed to reward. Whistleblower Incentives and Protection, 76 Fed. Reg. at 53177. The Commission's conclusion that the Covered Actions were not based on the conduct about which Kitchen supplied qualifying original information is neither arbitrary nor capricious and, therefore, he cannot recover a whistleblower award as a direct original source.

## B. Derivative Original Source

Kitchen alternatively argues that he is entitled to a whistleblower award as the original source of information on which the Commission did rely for the Covered Actions under the derivative source rule. The Whistleblower Rules recognize that individuals can be the original source of "information that the Commission obtains from another source if the information the whistleblower provide[d] satisfies the definition of original information and the other source obtained the information from the whistleblower or the whistleblower's representative." 17 C.F.R. § 165.2(*l*)(1). An individual claiming to be a derivative source must prove his status as such "to the Commission's satisfaction." *Id.* § 165.2(*l*).

Kitchen claims to be the derivative original source of the June 12 *Bloomberg* article which the Commission asserts triggered its investigation of FX benchmark manipulation. Nonetheless, the Commission found that "[n]othing in the record presents evidence to conclude that [Kitchen] was a source for the Bloomberg article," ROA 1577, and its conclusion is well supported. The record does not show that Kitchen ever communicated with any of the *Bloomberg* article's authors. Although he had previously copied various

*Bloomberg* email addresses on his communications with regulators, none matched the email of the article's listed authors. *Contrast* ROA 258, 264, 268, 408 (including *Bloomberg* addresses), *with* ROA 1066 (listing authors' email addresses). And, contrary to Kitchen's suggestion, we cannot assume collaboration among *Bloomberg* staff simply by virtue of a shared work location.

Moreover, no one from *Bloomberg* contacted Kitchen despite the fact that the article was published over a year after Kitchen's first email which included a *Bloomberg* address. And, as explained *supra*, the information in Kitchen's emails differed markedly from the scheme on which the *Bloomberg* article reported. The CFTC's conclusion that Kitchen was not a derivative source of the article does not "run[] counter to the evidence." *State Farm*, 463 U.S. at 43. Without establishing his status as the derivative source of original information about conduct on which the Covered Actions were based, Kitchen is not eligible for a whistleblower award. *See* 17 C.F.R. § 165.2(*l*).

Kitchen also claims he was a derivative original source of information in the June 14 *Bloomberg* article and June 17 *IB Times U.K.* article. He alleges the Commission "would invariably have also relied on" these articles in investigating the conduct underlying the Covered Actions. Appellant's Br. 33. We need not address this claim. "As a general rule, claims not presented to the agency may not be made for the first time to a reviewing court." *Omnipoint Corp. v. FCC*, 78 F.3d 620, 635 (D.C. Cir. 1996). Kitchen claims the June 14 *Bloomberg* and June 17 *IB Times U.K.* articles were "the subject of repeated arguments . . . to the agency." Appellant's Br. 33; *see also* Oral Arg. at 22:53–23:40. But the argument he made based on these articles before the Commission is not the same as the one he makes to us. Before the CFTC, Kitchen used the

later two articles as evidence that he was a source for the earlier, June 12 *Bloomberg* article that began the Commission's benchmark investigation. Now, he claims the later articles themselves were used in the Commission's investigation and the Commission's failure to mention them in its final orders was arbitrary and capricious. That argument is forfeit.

\* \* \*

For the foregoing reasons, we affirm the Commission's five final orders.

*So ordered.*